COURT
OF APPEALS

                                       SECOND
DISTRICT OF TEXAS

                                                   FORT
WORTH

 

 

                                        NO.
 2-07-077-CV

 

IN THE INTEREST OF M.W., A CHILD                                                      

 

                                              ------------

 

           FROM
THE 323RD DISTRICT COURT OF TARRANT COUNTY

 

                                              ------------

 

                                MEMORANDUM
OPINION[1]

 

                                              ------------

Appellant Sonja P. appeals
from the trial court order terminating her parental rights to M.W.  In one issue, she challenges the factual
sufficiency of the evidence to support the trial court=s best-interest finding.  We
affirm.

                                              Evidence

M.W. was born in 2002 when
Sonja was fifteen years old.  At the time
of trial, M.W. was four and Sonja was nineteen. 
M.W.=s father,
Daniel W., left Sonja when M.W. was four months old.[2]









In 2005, when M.W. was almost
three, she contracted bacterial meningitis, resulting in the amputation of both
legs at the knees, all of the fingers on her left hand, and multiple fingers on
her right hand.  She began to receive
physical therapy at Cook Children=s Medical Center in June 2005. 

Teresa Brumbaugh, a therapist
at Cook Children=s, testified
that M.W.=s  therapy initially included wound care because
M.W. had open wounds and a skin graft. 
Brumbaugh testified that without adequate wound care, the wounds would
take longer to heal and could lead to a life-threatening situation. Brumbaugh
intended to work with M.W. two to three times per week, but Sonja took her to
only about half of the scheduled appointments. 
Brumbaugh stressed the importance of attending the appointments to Sonja
both by phone and in person.  Sonja=s explanation for the missed appointments was lack of
transportation.  When the hospital
arranged transportation for her, Sonja cancelled the arranged transportation,
saying that she had transportation of her own, but then something would fall
through and M.W. would miss the appointment. 
Brumbaugh testified, AThere was always something, but typically it revolved around
transportation.@ 








When Sonja did take M.W. to
the hospital for therapy, M.W. was often visibly dirty and smelled of
urine.  Brumbaugh was concerned about
infection control because M.W.=s bandages were dirty.  She
instructed Sonja on how to remove M.W.=s bandages and clean her wounds, but she did not Athink that that  was probably
getting done.@  After the State removed M.W. from Sonja=s home in September 2005 and placed her in foster care, M.W. attended
all of her appointments.  Brumbaugh
testified that M.W. made minimal progress while she lived with Sonja and made
better progress after the State placed her in foster care. 

Brumbaugh testified that when
Sonja attended M.W.=s
appointments, she appeared to be nurturing and bonded with M.W. and was very
affectionate and loving towards M.W. during wound care sessions, which were
very painful.  

Carrie Carney, another Cook
Children=s therapist who worked with M.W. from June 2005 through April 2006,
testified that M.W. missed six of thirty-seven scheduled therapy appointments
early in her treatment, and another nine appointments were cancelled.  Carney said she was concerned that the missed
appointments would delay M.W.=s wound healing, which would in turn delay the start of range of
motion therapy and prosthetics fitting. 
Like Brumbaugh, Carney testified that when Sonja did bring M.W. to
appointments, M.W. was dirty and smelled of urine, which made Carney worry
about M.W.=s wounds
becoming infected.  Carney said that M.W.
made better progress after she was placed in foster care.   








Stacie Hall is an
investigator for the Department of Family and Protective Services (Athe Department@).  She testified that she received a referral
regarding M.W. in June 2005 because M.W. had missed several therapy
appointments. Hall explained to Sonja that Medicare-funded transportation was
available to her and told her that lack of transportation was no longer an
excuse for missing therapy appointments. 
But Sonja continued to miss appointments anyway, and Hall received
another referral regarding M.W. in September 2005.  When Hall visited Sonja=s home as part of her investigation, she found that M.W. and her
one-year-old sister, M.M., were healthy and clean and that M.W. had on clean
bandages.  Hall nevertheless made a
finding of Areason to
believe for medical neglect,@ and removed M.W. from Sonja=s home.  M.M. was not removed. 

Christine Petrone, a
Department caseworker, testified that she received M.W.=s case in October 2005 and developed a service plan for Sonja.  Sonja submitted to a psychological assessment
but failed to attend counseling sessions, again citing lack of transportation
as the cause.  Petrone told Sonja that
she needed to attend M.W.=s medical
appointments as part of her service plan, but Sonja continued to miss the
majority of appointments. 








Apart from a short stint as
an employee at a retail store, Sonja was unemployed.  Petrone testified that Sonja did not have
stable housing; at times she lived in an apartment, and at other times she
lived with friends.  When Petrone
transferred the case to another caseworker in April 2006, Sonja was living in
an apartment paid for by her boyfriend, John M. 
The Department=s permanency
plan was still reunification at that time, though Petrone had concerns about
Sonja=s ability to maintain stable employment and housing and her
willingness to take M.W. to her therapy appointments. 

The Department placed M.W.
with John M.=s
stepmother, Tonie S., for nine months. 
Tonie testified that she took M.W. to all of her appointments but that
Sonja attended only half of the appointments. 
Sonja went to Tonie=s house to visit M.W. on weekends, and she called M.W. every
night.  Tonie thought Sonja was making
good progress in the service classes. 
Eventually, Tonie returned M.W. to Department care because her husband
developed health problems and he and Tonie did not like the way the Department
treated them. 








Janice Barker works for the Aprotective homemakers department@ of Volunteers of America.  She
began working with Sonja on her homemaking skills in August 2006.  Barker testified that Sonja=s home Astarted off
clean, then we went through a period where it was not clean, and then after her
baby was born, it seemed to get back on track.@  The Aperiod where [the home] was not clean@ was when several people moved in with Sonja, which made Barker
concerned because Ait was very
crowded.  It seemed to get out of
control.@ Barker observed Sonja visit with M.W. at a Department office, and she
testified that the visit went very well, Sonja was nurturing and loving with
M.W., and Sonja and M.W. were bonded. 

Emma Lopez, a Asocial service tech@ with the Department, assisted Department caseworkers with
parent-child visitations.  She observed
visitations between Sonja and M.W. beginning in March 2006.  Sonja brought her other two children to the
visitations.  One came to the visitations
twice without shoes, and other times her clothes were dirty.  The other child appeared clean, but his blanket
had a bad smell, and Sonja propped his baby bottle up to allow him to feed
himself, even after Lopez advised Sonja that doing so could lead to
infections.  Sonja had a difficult time
paying attention to all three children during the visitations.  But Lopez also testified that M.W. required
close watching to make sure she didn=t injure herself, and she was never injured during one of the
visitations. 








Sandy Balderas, another
Department caseworker, testified that, in December 2006, she investigated a
report that Sonja=s other two
children were physically neglected.  When
Balderas visited Sonja=s home, she
saw a marijuana cigarette in an ashtray, and the smell of marijuana was very
evident as soon as she entered the home. 
Sonja admitted that she had smoked marijuana about two hours before
Balderas=s arrival and said she smoked marijuana twice a day. Sonja=s middle child was naked; Sonja said she was toilet training her.  The kitchen was Acrawling with roaches.@  Balderas opened the door to
the apartment=s balcony,
but could not walk onto the balcony because it was full of trash and pizza
boxes.  Balderas saw fist-sized holes in
the walls throughout the apartment; Sonja told her they resulted from furniture
being moved around. The mattress in the bedroom was on the floor and had no
linens on it.  Balderas found several
dirty diapers on the bathroom floor. 
Based on these findings, Balderas removed the children from Sonja=s home and placed them with Tonie S. 

Judy Olson is a child
advocate who visited M.W. several times while she lived with Tonie S. and again
while M.W. lived with the foster parents with whom she lived at the time of
trial.  Olson described M.W. as Avery happy, very settled . . . and pleasant.@  M.W. was doing very well in
school and making progress with the use of her prosthetics.  M.W. was scheduled for surgery to have part
of one leg bone removed soon after trial to make one of her prosthetics fit
more comfortably.  Her foster parents at
the time of trial were not interested in adopting her. 








Olson also visited Sonja at
Sonja=s apartment.  The apartment was
fairly tidy, but the carpet was very dirty. 
Olson said she had talked to Sonja about how difficult it would be for
her to care for three small children, especially when one needed to attend
numerous medical appointments and another one was a baby.  Olson was concerned that Sonja would tell her
what Olson wanted to hear and not tell her the whole story.  Sonja told Olson that she had a job at a
retail store but could not show her a pay stub, and the manager of the store
had no record of Sonja ever working there. 

Olson recommended that Sonja=s rights be terminated and said that termination was in M.W.=s best interest.  She testified
that M.W. needed to live with a family who can care for her, provide a clean,
safe, loving environment for her, and allow her to continue with her medical
therapy and education. 

Tomika Hardin was M.W.=s caseworker at the time of trial. 
Hardin testified that when she first received the case in December 2006,
she visited Sonja=s home.  Sonja=s middle child was naked, the home was a mess, and the baby was on the
floor on a mattress with a bottle propped in his mouth.  She found trash all over the floors, roaches
crawling around, holes in the walls, and trash on the patio.  Hardin was concerned about returning M.W. to
that environment because M.W needed a clean and sterile home environment.  At the time of trial, Sonja was living with
her sister and her sister=s husbandCwho had a criminal historyCin Mineral Wells.  She told
Hardin she planned to move to Mesa, but she had not told Hardin what the living
arrangements would be there. 








Hardin had read about Sonja=s marijuana use, but she saw no evidence of marijuana in the
home.  Sonja had attended twenty-seven of
twenty-eight drug counseling sessions, with the twenty-eighth scheduled for the
week of trial, but her last few drug tests were positive for marijuana. 

Hardin testified that her
major concern with Sonja was lack of stability because she did not have a job
and her boyfriend was paying her bills. 
She said termination was in M.W.=s best interest because she needs a stable, loving environment with
some sense of security.  Hardin testified
that M.W. was adoptable and very loving, very affectionate, and very
friendly.  She also said that M.W. had a
loving relationship with Sonja.  

Sonja testified that she had
moved several times while the case was pending, but denied that she ever lived
with friends.  She said her boyfriendCthe father of her other two childrenCgave her money for rent, food, diapers, baby formula, clothing, and
household supplies.  She testified that
she and her boyfriend had rented a trailer home and expected to move in shortly
after trial.  She acknowledged that her
boyfriend had not participated in any of the services in the service plan and
that he had refused to take a drug test for the Department. 








Sonja explained that she
missed many of M.W.=s therapy
appointments because she did not have stable transportation; her truck was
always breaking down, and the Medicaid transport arranged by Cook Children=s was always late.    Sonja testified that she completed all of the
parenting classes that were part of her service plan and took three additional
classes on her own initiative.  She said
that her final drug counseling session was scheduled for the day after trial
and that she had been clean since December 9, 2006.   

Sonja said she was looking
for work and had submitted an application for a job cleaning houses, which she
expected to pay $125 per week.  She had
been admitted to Everest College and intended to earn her high school degree. 

                                             Discussion

A.     Preservation

Before turning to Sonja=s factual sufficiency issue, we must address the State=s argument that Sonja failed to preserve her issue for our review
because she failed to request a hearing in the trial court on her statement of
points filed under family code section 263.405(b).  See Tex.
Family Code Ann. ' 263.405(b)
(Vernon Supp. 2007).  Relying on the
Dallas court of appeals=s opinion in
In re R.J.S., the State contends that a parent appealing a termination
in a case brought by the Department must Apresent@ a section
263.405(b) statement of points by both timely filing the statement and
requesting a hearing.  219 S.W.3d 623,
626 (Tex. App.CDallas 2007,
pet. denied).








This court recently rejected
the identical argument and declined to follow our sister court=s precedent.  In re J.A.B.,
No. 02‑06‑00404‑CV, 2007 WL 3037720, at *2 (Tex. App.CFort Worth Oct. 18, 2007, no pet. h.). 
For the same reasons articulated in our opinion in that case, we reject
the State=s
preservation argument.  See id.

B.     Factual sufficiency of
best-interest finding

In her sole issue, Sonja
argues that the evidence is factually insufficient to support the trial court=s finding that termination of her parental rights is in M.W.=s best interest.

When reviewing the evidence
for factual sufficiency, we must give due deference to the fact-finder=s findings and not supplant the judgment with our
own.  In re H.R.M., 209 S.W.3d
105, 108 (Tex. 2006).  We must determine
whether, on the entire record, a fact-finder could reasonably form a firm
conviction or belief that the termination of the parent=s parental rights would be in the best interest of the child.  In re C.H., 89 S.W.3d 17, 28 (Tex.
2002).  If, in light of the entire
record, the disputed evidence that a reasonable fact-finder could not have
credited in favor of the finding is so significant that a fact-finder could not
reasonably have formed a firm belief or conviction in the truth of its finding,
then the evidence is factually insufficient. 
H.R.M., 209 S.W.3d at 108.








Prompt and permanent placement
of the child in a safe environment is presumed to be in the child=s best interest.  Tex. Fam. Code Ann. ' 263.307(a) (Vernon 2002). 
There is also a strong presumption that keeping a child with a parent is
in the child=s best
interest.  In re R.R., 209 S.W.3d
112, 116 (Tex. 2006).  Nonexclusive
factors that the trier of fact in a termination case may use in determining the
best interest of the child include:

(1)    the desires of the child;

 

(2)    the emotional and physical needs of the child now and in the
future;

 

(3)    the emotional and physical danger to the child now and in the
future;

 

(4)    the parental abilities of the individuals seeking custody; 

 

(5)    the programs available to assist these individuals to promote the
best interest of the child;

 

(6)    the plans for the child by these individuals or by the agency
seeking custody;

 

(7)    the stability of the home or proposed placement;

 

(8)    the acts or omissions of the parent which may indicate that the
existing parent‑child relationship is not a proper one; and

 

(9)    any excuse for the acts or
omissions of the parent.

Holley v. Adams, 544 S.W.2d 367, 371B72 (Tex. 1976).








These factors are not
exhaustive; some listed factors may be inapplicable to some cases; other
factors not on the list may also be considered when appropriate.  C.H., 89 S.W.3d at 27.  Furthermore, undisputed evidence of just one
factor may be sufficient in a particular case to support a finding that
termination is in the best interest of the child.  Id. 
On the other hand, the presence of scant evidence relevant to each
factor will not support such a finding.  Id.

We will consider the Holley
factors applicable to this case.

1.                 
Present and future physical needs and physical dangers








Of all the Holley factors, M.W.=s current and future physical needs are
paramount.  The evidence showed that,
because of her physical disability, M.W. will need extraordinary medical and
therapeutic care now and in the future. 
The record shows that Sonja was unable to provide reliable
transportation for M.W. during the critical wound-care phase of M.W.=s therapy, even when free
transportation was arranged for her. 
Moreover, the record shows that Sonja was unable to keep her home clean
when M.W. needed a clean environment to minimize the risk of infection.  While the immediate and serious risk of wound
infection had apparently abated by the time of trial because M.W.=s wounds had healed, she was scheduled
to undergo surgery to remove part of a bone in her leg shortly after trial, and
Carney testified that M.W.=s
prosthetics could cause new wounds, either of which would renew the risk of
infection.  These factors weigh heavily
in favor of termination.

2.                 
Present and future emotional needs

The record shows that M.W. is bonded to Sonja and
has an appropriate and loving relationship with her.  This weighs against termination.  The record also shows that M.W. is very happy
with her foster parents, is very outgoing, easily adapts to new people in her
life, and is adoptable.  Thus, while M.W.
is bonded to Sonja, an adoptive family should be able to meet her emotional
needs in the future.

3.                 
Sonja=s
parental abilities

The record shows that Sonja=s
parental abilities are less than optimal. 
She was unable to provide a clean, stable home for any of her
children.  She admitted to smoking
marijuana while caring for her two younger children.  Sonja had difficulty managing all three
children during visitations with M.W. 
Even after warnings about allowing her youngest child to feed from a
propped-up bottle, Sonja continued that practice.    

4.                 
Programs available to assist Sonja to promote M.W.=s best interest

 








Sonja completed the parenting classes required by
her service plan, plus another three she completed on her own initiative.  But the record also shows that she failed or
refused to use the transportation program available to help her take M.W. to
her therapy appointments.  Thus, the
evidence shows that programs are available to assist Sonja, but she is not
always willing to use them for M.W.=s
benefit.

5.         Any excuse for Sonja=s
acts and omissions

Sonja=s
relatively young age was one excuse for her acts and omissions, but not one
that weighs against termination.  She
made excuses for her behavior, but various witnesses expressed frustration with
her explanations.  Brumbaugh said, AThere was always something@ to prevent Sonja from taking M.W. to
therapy.  Petrone said, A[I]t was one excuse after another.@ 
Hardin said Sonja was a lot of talk and no action. 

6.                 
Other considerations








Sonja argues that the trial court was forced to
make a premature termination decision by family code section 263.401=s eighteen-month deadline to commence
trial or dismiss a termination suit.  See
Tex. Fam. Code Ann. ' 263.401 (Vernon Supp. 2007).  She also suggests that the trial court should
have denied the Department=s
petition for termination and ordered M.W. to remain in foster care until Sonja
could prove that she was drug free, find employment, establish a stable home,
and show that she was capable and willing to act in the best interest of a
child with M.W.=s
exceptional needs.  But as the State
responds, Sonja already had eighteen months from the time the Department filed
suit to accomplish these tasks, and she had accomplished none of them.  Sonja does not explain how further delay and
perhaps another trial are consistent with the presumption that prompt and
permanent placement is in M.W.=s
best interest.  See id. ' 263.307(a).

                                             Conclusion

This is not a simple
case.  The evidence does not weigh
entirely in favor of termination.  All
witnesses agreed the M.W. was bonded to Sonja and that they had a loving
relationship, but the evidence also shows that Sonja is unable to meet M.W.=s physical needs.  Mindful that
we must give due deference to the fact-finder=s findings and not supplant them with our own, and
considering the entire record in this case, we hold that a reasonable
fact-finder could form a firm belief or conviction that termination is in M.W.=s best interest.  See In re
C.H., 89 S.W.3d at 28.  We therefore
overrule Sonja=s sole issue
and affirm the trial court=s termination order.

PER CURIAM

 

PANEL F:    GARDNER, WALKER, and MCCOY, JJ.

 

DELIVERED:  March 6, 2008











[1]See Tex. R. App. P. 47.4.





[2]Daniel
was served with process in the trial court proceedings but did not make an
appearance.  The trial court terminated
Daniel=s
parental rights, and Daniel has not filed an appeal.